Per Curiam:
This case was referred to Trial Commissioner Donald E. Lane with directions to make findings of fact and recommendation for conclusions of law under the order of reference and Eule 57(a). The commissioner has done so in an opinion and report filed on June 7, 1967. Exceptions to the commissioner’s findings and recommended conclusion of law were filed by defendant, briefs were filed by the parties and the case has been submitted to the court on oral argument of counsel. Since the court is in agreement with the opinion, findings and recommended conclusion of law of the commissioner it hereby adopts the same as the basis for its judgment in this case as hereinafter set forth. Therefore, the court concludes that claims 1, 2, 4, 6, and 7 of patent 2,715,008 are valid and have been infringed by defendant; that claims 1, 3, and 4 of patent 2,903,767 are valid and have been infringed by defendant’s unlicensed use of the subject inventions; that plaintiff is entitled to recover reasonable and entire compensation; and that judgment is entered for plaintiff to that effect with the amount of recovery to be determined pursuant to Eule 47(c) (2).
*712 OPINION OP COMMISSIONER
Lane, Oonvmissioner: This is a patent suit under Title 28 U.S.C. ■§ 1498, in which plaintiff seeks to recover reasonable and entire compensation for the alleged unauthorized use of patented inventions. Plaintiff alleges infringement of claims 1,2,4, 6, and 7 of U.S. Patent No. 2,715,008 and claims 1, 3, and 4 of U.S. Patent No. 2,903,767. Patent 2,715,008, sometimes referred to as the ’008 patent, issued August 9, 1955, for “Apparatus For Cargo Tie-Down And The Like.” Patent 2,903,767, sometimes referred to as the ’767 patent, issued September 15,1959, for “Chain Securing Device With Tilting Block.” Plaintiff, Eastern Rotorcraft Corporation, is the owner of the patents in suit by assignment from the patentee, J. R. Huber. The parties have agreed to defer the accounting issues until after a decision by the court on liability.
It is concluded that claims 1, 2, 4, 6, and 7 of the ’008 patent are valid and infringed; that claims 1, 3, and 4 of the ’767 patent are valid and infringed; and that the defendant is not entitled to a license under either patent.

Patent No. 2,715,008

The ’008 patent describes and claims a device for securing cargo during transport, utilizing high strength flexible cable engaging the cargo as a securing member. The wire cable is held tight by a lightweight, compact, adjustable, anchoring device. The anchoring device, sometimes termed a tie-down, permits easy adjustment of the length and tension of the cable and prevents damage to the cable due to clamping pressure which must be applied to secure the cable about the cargo. The tension on the cable is used to transmit a reduced and variable clamping force to the free end of the cable. Finding 3 sets forth a detailed description of the construction and operation of the claimed invention.
Plaintiff asserts that claims 1, 2, 4, 6, and 7 of the ’008 patent are infringed by defendant’s use of devices supplied by the Monmouth Electric Company. Defendant asserts these claims are invalid under the provisions of Title 35 U.S.C. § 103 because the subject matter of the invention would have *713 been obvious to one skilled in tbe art at tbe time tbe invention was made. No single patent relied on by defendant discloses a device containing all tbe elements recited in tbe ’008 patent claims as required for an anticipation under Title 35 U.S.C. § 102.
Eecently, the Supreme Court laid down general guidelines to be followed in applying Section 103.
* * * Under § 103, tbe scope and content of tbe prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in tbe pertinent art resolved. Against this background, tbe obviousness or nonobviousness of tbe subject matter is determined. Graham v. John Deere Co., 383 U.S. 1, 17, 148 USPQ 459, 467 (1966).
The prior art principally relied on by defendant includes patents to Passek, No. 2,066,049, Hyatt, No. 2,540,887, and Eeynolds, No. 1,913,566, which are described in findings 6, 8, and 10. Differences between the subject matter of the accused claims and each of the Passek, Hyatt, and Reynolds devices are set forth in findings 7, 9, and 11, respectively. The dissimilarity in the basic function and structure of each of these prior art patents from the other prior art patents, and also the ’008 patent claims, results in a finding that the combination claimed in the ’008 patent is not suggested by the prior art. Even if the separate concepts of the prior art are combined using the ’008 patent as a blueprint, with an impermissible hindsight reconstruction of the prior art, certain elements and functions of the claimed tie-down remain novel and unobvious. The prior art as a whole fails to suggest a cable-deflecting member for deflecting the loaded end of a cable in a manner which imposes increased tension on the loaded run of the cable, increases the frictional contact of the cable about a snubbing drum, and transmits a clamping force to the free run of the cable. the primary prior patents do not suggest a snubbing action wherein friction between the cable and a snubbing drum resists the majority of the tension force tending to slide the cable longitudinally from a tie-down. No combination capable of the easy length adjustment and release features of the claimed tie-down is supplied by combining the prior disclosures. It is concluded that the ’008 patent claims are drawn to subject matter which was *714 unobvious as a whole to one skilled in the art at the time the invention was made.

Patent No. 8,903,767

The ’767 patent describes and claims a cargo tie-down, an anchoring structure for use with a link type chain, to prevent shifts in position of heavy cargo. The ’767 cargo tie-down device includes a hook at one end for quick attachment to a deck ring or ground anchor, and a tilting block for connection with and disconnection from the chain links. The tilting block is pivotally supported near one end of the frame of the tie-down device and may be pivoted between a loaded position and a release position wherein the chain may be disengaged from the block while under tension. The tilting block contains a slot and a pocket to hold two adjacent links of the chain. A pivoted primary latch is provided to regulate the pivotal movement of the block. A pivoted secondary latch is provided to prevent accidental release of the chain from the block. The secondary latch permits quick removal of one chain link and insertion of another link when adjusting the effective length of the chain, without disturbing the primary latch. The secondary latch is inactive when the primary latch is released. The pocket in the tilting block is shaped to engage a chain link disposed generally transverse to the loaded chain.
Plaintiff asserts defendant’s use of cargo tie-downs supplied by the AID Corp. infringes claims 1, 3, and 4 of the ’767 patent. The principal defenses raised by the defendant with regard to the ’767 patent are (1) that patent claims 1, 3, and 4 are invalid in view of the prior art, (2) that the defendant has not infringed these claims, and (3) that the defendant is entitled to a license under the ’767 patent.
In support of its contention of invalidity in view of the prior art, defendant has cited a number of patents and publications. Patents to Stahl, et al., No. 1,963,634, and to Har-rop, No. 907,495, described in findings 19 and 21, are each alleged by defendant to anticipate patent claim 3 as that term is used to denote lack of novelty under Title 35 U.S.C. § 102. The teachings of these two patents when compared *715 with patent claim 3, do not illustrate the same combination of elements. Nor does any construction disclosed by these patents perform the same function as the combination recited in claim 3 to achieve substantially the same results.
■ Patent claim 3 is also found not invalid under the provisions of Title 35 U.S.C. § 103. The basic utility of a tilting block for use as a cargo tie-down would not have become obvious to one skilled in the art having knowledge of the Stahl and Harrop patents. The recited spatial and functional relationships of the elements of patent claim 3 are essential to successful operation of the device as a tie-down. These relationships, nowhere suggested in the Stahl and Harrop patents, are precisely defined and set forth in claim 3. The frame recited in patent claim 3 is located in line with a loaded chain connected thereto; the tilting block incorporates a chain pocket adapted to engage a chain link disposed generally transverse to the loaded chain; the tilting block incorporates a slot to accommodate a chain link extended in the direction of the loaded chain; the block is rotatable to allow it to tilt so that the transversely disposed link may be moved to a position of disengagement with the block under the chain load; the cylindrical stop member extends between side plate parts to limit movement of the block and structurally strengthen the frame. These specific recitals define a structure that would not have been obvious as a whole to one having skill in the cargo tie-down art at the time the Huber ’767 invention was made.
Four patents have been relied on by defendant in asserting the invalidity of patent claims 1 and 4 under Title 35 U.S.O. § 103. The two basic disclosures which defendant urges against these claims are the Stahl and Harrop patents discussed supra. Patent claims 1 and 4 recite a secondary latch to engage and retain a chain link in the slot of the block, and defendant has cited the French patent to Aivaz, No. 965,882, and the patent to Moore, No. 1,179,951, in an attempt to show that the added secondary latch element would have been obvious. Claims 1 and 4 use language which differs in terminology, but not in patentable significance, from the language in claim 3 for defining the functional and spatial relationships between the chain, frame, block, pocket, slot, *716 and primary latch member. These relationships make the structures defined in all these claims unobvious. The secondary latch structure is an added unobvious feature of patent claims 1 and 4. It is concluded that claims 1, 3, and 4 of the ’767 patent are novel and are not drawn to subject matter obvious as a whole. These claims are not invalid under Title 35 U.S.C. §§ 102 and 103.
In support of its defense of noninfringement, defendant has pointed to a pivoted member or lever in the AID tie-down construction which has no counterpart in the plaintiff’s patented construction. The tilting block of the AID device is pivotally mounted on the lever which in turn is pivotally supported in the frame. The tilting block plus the lever in AID comprises a unit which performs all the functions of the tilting block of the patent claims. That the AID device involves an additional element does not avoid infringement. See Duo-Flex Corp. v. Building Service Co., 322 F. 2d 94, 138 USPQ 542 (5th Cir. 1963). The lever, as an additional element, is alleged by defendant to result in an improvement over plaintiff’s invention. However, one who practices an improvement invention without a license under the basic patent of another is an infringer. Temco Elec. Motor Co. v. Apco Mfg. Co., 275 U.S. 319, 328 (1928).
Defendant also contends that claims 1 and 4 are not infringed by its use of the AID device because these claims when construed in view of the file history require that the secondary latch be supported by a specific member. However, claim 1 when given an interpretation consistent with the patent specification and file history, reads directly on the AID device. Claim 4 does not read directly on the AID device, but it is concluded that this claim is entitled to a range of equivalents which encompasses the positioning of the secondary latch of the AID device. The position of mounting the secondary latch was not a factor which was. used to distinguish the Huber application claims from the-prior art before the Patent Office. The applicant canceled a. claim which defined the position of the secondary latch in more general terms than defined in allowed claims 1 and 4.. At the time said claim was canceled, a new claim was submitted and later allowed which claim did not recite a second *717 ary latch, and was not limited as to the mounting of the secondary latch. Also, applicant later submitted and obtained the allowance of a claim similar to issued claim 1 except for the description of the mounting of the secondary latch. This later filed claim issued as claim 6. In view of the entire Huber ’767 application file history, it is concluded that the strict application of the doctrine of file wrapper estoppel as urged by defendant is not warranted.
The doctrine of file wrapper estoppel does not necessarily apply to the extent of depriving a patentee of all equivalents. Cancellation of a broad claim precludes an extension of claim coverage by equivalents to encompass the entire scope of the canceled claim. However, the patentee after cancellation of a broad claim is still to be afforded protection against obvious and exact equivalents. Southern Textile Machinery Co. v. United Hosiery Mills Corp., 33 F. 2d 862, 866 (6th Cir. 1929). In this case, the range of equivalents can permissibly extend at least as far as the recitations relative to mounting of' the secondary latch in other allowed patent claims. The secondary latch of the AID device is the exact functional equivalent of the secondary latch of claim 4 and lies within the permissible range of equivalents of claim 4. Claims 1, 3, and 4 of the ’767 patent are infringed by defendant’s unauthorized use of the AID tie-down device.
Defendant has contended that the Government is entitled to a license to use the ’767 patent because of the provisions of fixed price contract No. AF 33(038)-22917, dated March 29, 1951, for 56 aircraft cargo tie-downs and engineering data. The contract included an exhibit setting forth applicable specifications and requirements. The Government’s patent rights under the contract are defined by clause 38(b) which requires the contractor (plaintiff here) to grant an irrevocable nonexclusive, nontransferable, and royalty-free license to the Government to practice or cause to be practiced for the Government each “subject invention.” The contract definition of the term “subject invention” in clause 38(a)(i) reads:
The term “Subject Invention” means any invention, improvement or discovery (whether or not patentable) conceived or first actually reduced to practice either (A) *718 in the performance of the experimental, developmental or research work called for under this contract, or (B) in the performance of any experimental, developmental or research work relating to the subject matter of this contract which was done upon the understanding that a contract would be awarded.
The 22917 contract required plaintiff to fabricate six 5,000-pound-capacity chain tie-downs and deliver same to the Air Force for test and approval. Approval of the first 6 was required before fabrication of the remaining 50 tie-downs to be supplied together with a set of engineering data prepared in accordance with the contract exhibit. Plaintiff completed all design work under the 22917 contract no later than November 14, 1952, a date prior to the conception and reduction to practice of the invention claimed in the ’767 patent. The ’767 invention lies without the contract definition of “subject invention” because it was not made in the performance of experimental, developmental, or research work called for under the contract. That the supply phase of the contract remained to be completed at the time the ’767 invention was conceived is not material.
Defendant relies on Mine Safety Appliances Co. v. United States, 176 Ct. Cl. 777, 364 F. 2d 385, 150 USPQ, 453 (1966). In that ease, which involved a research and development contract, the court held the Government was entitled to a license under a patented invention which was conceived during the existence of the contract and where the subject matter of the invention fell within the scope of the research and development work. In the present case, the ’767 invention was conceived after the contractor had completed all research, experimental, or developmental work for which he could receive payment by the Government under the 22917 contract.
The relationship between the subject matter of the invention of the '767 patent and the scope of work under contract 22917 involves several factual considerations. First, the performance specifications stated in the 22917 contract are broad enough to encompass the subject matter of the patented invention. However, the course of action of the contracting parties establishes that the actual scope of development work under the contract was restricted. The starting point for development work under the contract was a proto *719 type tie-down device exhibited by plaintiff to the Air Force just prior to formation of the contract. This prototype incorporated a fixed jaw and a movable jaw to grasp the chain. Development work under the contract involved modifying the prototype to conform to the performance specifications of the contract. The development work was necessary because the 5,000-pound capacity was different from the capacity of chain-type tie-downs then in use. The tie-down device which was accepted by the Air Force under the 22917 contract utilized a fixed jaw and a movable jaw to grasp the chain. Defendant has failed to connect the development work performed under the 22917 contract and paid for by the Government with the conception of the tilting block tie-down device which forms the subject matter of the '767 patent. The fundamental differences in structure and function which exist between the jaw-type tie-down supplied under the 22917 contract and the tilting block tie-down of the patented invention preclude a conclusion that the development work under the 22917 contract led to the '767 invention.
This case does not involve a factual situation wherein the contractor’s unilateral action carved out a valuable invention from a Government-financed research project. The evidence shows that engineering and development costs incurred after the design of the tie-downs delivered under the 22917 contract would not be allowable costs under the contract. It is concluded that defendant is not entitled to a license under the '767 patent.
Defendant opposed the admission into evidence of correspondence and memoranda written by J. C. Warfield, Jr., Associate Patent Counsel, Office of Patent Counsel, Department of the Navy, for other than the limited purpose of showing existence of such written matter. These writings discuss facts relating to the Govermnent’s claim of a license under the '767 patent and also reach a legal conclusion. The Warfield writings include statements of fact made by a public officer in the course of his official duties. Such statements are admissible against the public body which employs him. See George A. Fuller Co. v. United States, 108 Ct. Cl. 70, 69 F. Supp. 409 (1947). Admissibility of thése writings conforms to modern concepts of the reasons' for the hearsay *720 rule as set forth in the Uniform Eules of Evidence, Eule 63 (15). Exclusion of Warfield’s admissions because of their content, mixed statements of fact, and conclusions of law, is not required. See Chicago v. Greer, 76 U.S. 726, 732-33 (1869). The statements of fact in the Warfield documents are properly receivable in evidence. The defendant has offered no evidence sufficient to overcome said statements. In his written memorandum of a conference with representatives of Eastern Eotorcraft Corporation, Warfield stated that accounting records clearly establish that the Government did not reimburse Eastern Eotorcraft Corporation for the engineering development of the tiltable block chain tie-down device covered by the '767 patent and that said tie-down device was an independent development not under the 22917 contract. These statements by defendant’s employee are not in conflict with other evidence presented by the plaintiff in this case.
Summarizing, it is concluded that the patent claims in issue are valid, that the defendant was not authorized or licensed to use the inventions defined therein, and that plaintiff is entitled to recover reasonable and entire compensation for such use, the value of which should be determined in further proceedings pursuant to Eule 47 (c).
Findings of Fact
1» This is a patent suit arising under 28 U.S.C. § 1498, to recover plaintiff’s reasonable and entire compensation from the defendant for the unauthorized use or manufacture by or for the United States, of the inventions described in and covered by United States Letters Patents Nos. 2,715,008 and 2,903,767 owned by plaintiff. Plaintiff is a corporation organized and existing under the laws of the Commonwealth of Pennsylvania, and having its principal office and place of business at Doylestown, Pennsylvania. Plaintiff’s petition pending motion for discovery was filed July 31,1962, and its first amended petition was filed October 29,1962.
2. Plaintiff is the owner of the entire right, title, and interest in and to United States Patents Nos. 2,715,008 (hereinafter sometimes referred to as the ’008 patent), issued *721 August 9, 1955, for “Apparatus For Cargo Tie-Down And The Like,” and 2,903,767 (hereinafter sometimes referred to as the ’767 patent), issued September 15, 1959, for “Chain Securing Device With Tilting Block,” by virtue of written assignments from John Richard Huber, the patentee named in each of said Letters Patent, and plaintiff has continuously been the sole owner of said Letters Patents and of all rights secured thereby, from the issuance thereof. Counsel have agreed that any accounting issues are reserved for trial subsequent to the opinion of the court on liability.
3. Plaintiff’s ’008 patent resulted from an application for patent filed April 3, 1950. The patent discloses a device for securing cargo during transport by using a high-strength flexible cable and a cable-securing device, the latter being capable of quick adjustment and being nondamaging to the cable. Reference is made to Figs. 1, 2, and 3 of the patent drawings, defendant’s exhibit DD-2, incorporated by reference. The structure and operation of the device in the ’008 patent may be briefly described as follows: The straight or load portion of the cable 15' enters at the upper end of the unit, passing a pair of spaced blocks 21, 21, makes a turn- and-a-half wrap around a fixed snubbing drum 19, located near the opposite end of the unit, and then emerges from the upper end of the unit, passing between a movable shoe 27 and a fixed shoe 25. The far end of the cable is attached to an anchor 13, and the slack is removed from the cable by pulling up on its free end until it holds the load securely and is tightly wrapped around the snubbing drum. Then the device is locked by rotating a handle 30, which is integral with a cam element 32, which element moves an arc-shaped cable-deflecting member 22 into engagement with the loaded run of the cable 15 and deflects the cable into the space between the blocks 21, 21. The load impressed on the cable-deflecting member by the resilience of the cable is transmitted by the cam block 32 to the movable shoe 27 which applies clamping pressure along a substantial length of the free end of the cable, clamping it against the fixed shoe 25. This clamping pressure provides the restraint necessary to effect snubbing of the cable around the drum 19. The cam 32 and *722 the movable shoe 27 are mounted in oval slots, so that they can float, in a transverse sense, with respect to the device. Consequently, as load on cable 15 increases, the cable tends to straighten, and, because they are free to float, the cam and the shoe 27 can move enough to increase the clamping pressure on the free end of the cable.
4. Plaintiff asserts that claims 1, 2, 4, 6, and 7 of the ’008 patent are infringed by defendant’s use of devices supplied by the Monmouth Electric Company. Claim 7 is set forth below with the separate elements appearing in separate paragraphs for ease of identification.
Claim 7 of the '008 Patent
An adjustable tie down device having a body with an anchoring member located at one end,
cable clamping mechanism supported by said body including
a fixed snubbing drum located in the mid section of said body,
a movable cable engaging part located near the end of said body opposite the anchoring member to deflect the loaded side of the cable where it enters the body before passing around said drum,
a clamp mechanism located at the end of said body opposite the anchoring member in position to engage the unloaded end of the cable after it has passed around said drum,
movably mounted connecting means extending between said cable engaging part and said clamp mechanism to provide increased clamping upon increase in the cable load.
The other patent claims in suit are somewhat narrower in that they define one or more of the elements of claim 7 with increased specificity.
5. Defendant has designated five prior domestic patents in support of its contention that the asserted claims are invalid under the provisions of Title 35 U.'S.C. § 103 for obviousness. Defendant has not contended that any one of these five patents invalidates the asserted claims under th¿ provisions of 35 U.S:C. § 102 for lack of novelty. The prior patents are Passek, 2,066,049, issued in 1936; Hyatt, 2,540,887, filed in *723 1948; Reynolds, 1,913,566, issued in 1933; Bittle, 1,553,430, issued in 1925; and Ellis & Gladding, 78,794, issued in 1868.
6. Passek patent, defendant’s exhibit 202, incorporated by reference, discloses rope-clamping devices for taking up slack in a rope or the like. The device illustrated in Fig. II of the exhibit comprises a flat circular block having an angled passage and a straight passage therethrough. Extending transversely across the two passages is a third passage or bore 4, in which is mounted a pin 5 having a rounded head 6 which projects into the angled passage at its vertex, and having a roughened end or foot 7 extending to the straight passage. The tension end of the rope passes through the angled passage, over the head 6 of the pin. It is then engaged about a post P and returned through the straight passage. The block slides along the rope for adjustment to the desired position. Tension imposed on the loaded end of the rope causes the rope to straighten in the angular passage, thereby urging the pin 5 in the bore 4 against the rope in the straight passage which will clamp the rope and prevent displacement of the block. In another form of the Passek device, illustrated in Figs. VI-YIII, the circular block is provided with an internal circular (cavity) open to the exterior at diametrically opposite points. Disposed within the hollow of the block is a floating clamp or wedge element 5b of lozenge shape having toothed or roughened edges for clamping the rope. The two ends of the wedge element lie between the lozenge and the inner wall of the circular hollow. Tension applied on the end of the rope R causes the wedge element to turn so that its toothed edge will grip the tension end of the rope on the left side of the device and the opposite toothed edge will grip the free end of the rope on the right side of the device.
7. Differences exist between the Passek adjustable clamp devices and the invention defined in the ’008 patent claims in suit. There is no snubbing drum in the Passek devices. The load is passed directly from the rope to a post rather than through a body member such as a cargo tie-down. Slack in the rope is adjusted by sliding the entire Passek clamp device toward or away from a post. The Passek clamp would not be capable of adjustment for slack if mounted in the rigid *724 body of a cargo tie-down device. The pin illustrated in Fig. II, and the wedge element of the alternate embodiment of Figs. YI-YIII act as tension-sensing elements. These elements are floatingly mounted so that increased tension in the loaded run of the rope creates an increased clamping pressure. These Passek members are incapable of being moved to positively deflect a rope being held under slight tension as in the locking procedure of the claimed Huber cargo tie-down, a procedure which tends to tighten the loaded end of the cable about the cargo. There is no means described or illustrated in the Passek patent which would permit release of the clamp when under substantial tension.
8. Hyatt patent, defendant’s exhibit 200, incorporated by reference, discloses a cargo tie-down device. The cargo tie-down illustrated in Fig. 2 comprises a casing 10 with one end formed to provide a V-shaped pocket formed by blocks 18 and open at its lower end to pass both runs of cable 32. A V-shaped wedging member 15 is movable in this pocket. A portion of the cable is looped around the curved upper surface of the wedge and between it and the blocks 13. An actuating lever 24, having an oval cam 25, moves the floating block 19 first into clamping engagement with the portion of the loop of cable which passes over the large upper end of wedge 15, and thereafter transmits clamping pressure to move the wedge 15 downward to wedge the cable between the wedge and the blocks 13. When the operating lever is swung into release position, not illustrated in the Hyatt patent, the wedge member 15 is moved upward by spring 18. The patent to Hyatt was considered by the Patent Office examiner during prosecution Of the Huber application which resulted in the ’008 patent.
9. Differences exist between the Hyatt cable-anchoring device and the invention defined in the ’008 patent claims in suit. Hyatt does not disclose a movable cable-engaging part to deflect the loaded side of the cable before it passes around a snubbing drum. The cable in the Hyatt device always is positioned against the upper surface of the wedge 15 which does not perform any snubbing function. The clamping pressure exerted is applied to the. loaded end and the free end equally. The cam element 25 of Hyatt applies an extraneous *725 force, first, to bold the cable 20 between the block 19 and the top of the wedge 15, and subsequently to force the wedge 15 downward between the blocks 13.
10. Reynolds patent, defendant’s exhibit 201, incorporated by reference, illustrates in Fig. 1 a snubbing device for pulling taut a rope, cable, or the like. The device includes two semicircular members 8 and 8 mounted on a base 2. The opposing edges 12 of these members are termed the working edges. One member 6 is rigidly mounted; the other member 8 is pivotally mounted on the base. In tracing the path of a cable 14 from its free end A, the cable first passes between the straight edges 12,12 of the members 6 and 8, then around the arcuate surface of the pivoted semicircular member 8, around the arcuate surface of the fixed semicircular member 6, and then runs to the load. A pivoted cam lever 16 is provided to bold the semicircular members 6 and 8 apart for free movement of the cable 14 during initial adjustment. When the cam lever 16 is in its release position, tension on the loaded end of the cable draws the working edge 12 of the pivotally mounted semicircular member toward the fixed member to clamp the cable. The clamping force applied to the cable between the straight edges 12,12 is proportional to the tension applied to the loaded end of the cable. An alternative embodiment of the Reynolds patent disclosure is illustrated in Fig. 8 which for purposes of this litigation is equivalent to the embodiment shown in Figs. 1-7 and described above.
1. Differences exist between the devices disclosed by Reynolds and the 'Huber ’008 invention defined in the claims in suit. the pivotally mounted semicircular member of the Reynolds patent is not a deflecting means and is not functionally equivalent to the arcuate member 22 of the ’008 patent construction. the cam lever 16 in Reynolds is not the equivalent of cam member 32 in the ’008 patent construction. the lever 16 in Reynolds is operative only to relieve all clamping pressure from the clamping area, whereas in the ’008 patent construction the cam or interconnecting link 32 transmits variable clamping pressure from the cable-deflecting element to the clamping area. The movable semicircular member 8 of the Reynolds patent construction cannot dis *726 tribute the clamping pressure along a substantial length of the free end of the cable, and it is incapable of floating when mounted on a fixed pivot at one end. The snubbing provided in the Reynolds patent devices is exceedingly small in comparison to that resulting from the !008 patent construction. The Reynolds device without modification could not be used as a cargo tie-down.
12. Bittle patent, defendant’s exhibit 203, entitled Cable Snubbing Device, shows that wrapping a cable about a drum more than one turn to help prevent longitudinal movement of the cable is an old principle. Ellis & Gladding patent, defendant’s exhibit 204, discloses a lever-actuated cam for moving a grooved jaw which is alined parallel to a fixed jaw for clamping a hawser.
13. Defendant contends that the separate concepts disclosed in the previously discussed prior art patents make the invention of the asserted ’008 claims obvious to one skilled in the art. It is found that the separate concepts disclosed in the references do not suggest the Huber invention defined in the patent claims in suit. Attempts to combine the structures disclosed in the Hyatt, Passek, and Reynolds patents would result in impairment of the functioning of the separate elements of each structure.
14. The inventive concept of the ’008 patent, defendant’s deposition exhibit 2, is to snub a flexible tie-down cable around a fixed snubbing drum so as to enable a small force applied directly to the unloaded run of that cable to result in holding the loaded cable against large tension forces. This is accomplished, with the loaded cable drawn taut, by moving the cam or block 32 so as to cause it to force the cable-deflecting member 22 to bend the loaded run of the cable 15 into the space between the fixed blocks 21,21. This tightens the cable around the snubbing drum 19 and simultaneously imposes a load on the anchoring member 27. The clamping force is approximately 10 percent of the total load on the tension end of the cable. Neither the Passek nor the Hyatt patent structures contemplates any snubbing action at all. In Reynolds, the clamping force applied at the left end of the member 8 is almost as great as the total load on the tension end of the cable. The combination of elements which *727 achieves the inventive concept is recited in varying detail in each one of the patent claims in suit. The concept and elements of the ’008 invention are not found in the primary patents. The secondary patents cited by defendant, patents to Bittle and Ellis, do not significantly add to the teachings of the primary references. It is found that the invention as a whole as claimed in patent claims 1, 2, 4, 6, and 7 of the ’008 patent would not have been obvious to one having ordinary skill in the art at the time the invention was made.
15. Within 6 years prior to the filing of plaintiff’s first amended petition, defendant without authorization or license of plaintiff purchased from Monmouth Electric Company cargo tie-downs and like devices substantially identical to that shown in the drawings attached to commissioner’s exhibit 1. This exhibit shows that the accused device is structurally identical to the patented combination. The record establishes that the mode of operation is the same and that the objectives of the patent are attained in the same way in the accused device. Claims 1, 2, 4, 6, and 7 of the ’008 patent have been infringed by defendant’s use of the Monmouth device.

Patent 2,903,767

16. Plaintiff’s ’767 patent, defendant’s deposition exhibit 1, resulted from an application for patent filed November 27, 1953, and discloses a device for securing and tightening a tie-down chain. The device is particularly useful in tying down heavy equipment in aircraft because of its compact design and its high strength-weight ratio. The structure and operation of a chain-securing device as illustrated in Figs. 2 and 3 of the ’767 patent may be briefly described as follows: A welded link chain 11 which serves as a tie-down tension member is attached to the securing device by means of a tilting block 17, which has a slot 33 communicating with a pocket 35, adapted to receive adjacent links 11a and 11c respectively, of the chain 11. The slot 33 is best seen in Fig. 3, and the pocket 35, in Fig. 2, which also shows the chain 11 in its locked position. The tilting block 17 is pivotally mounted ¡between the side frame members 15 by pivots 18. The tilting block 17 is held in position under load by the *728 cam legs 22, carried on the release handle 25, which lock against the mating cam legs 20, carried on the tilting block 17. When the handle 25 is moved to release position, out of notches 29, as illustrated in Fig. 6, the cam legs disengage, thus allowing the block 17 to tilt clockwise about its pivots 18. When the block 17 has tilted to a point at which the pocket 35 lies at an acute angle of about 75° to the direction of chain pull, the link 11c will slide out of the pocket 35, and the chain 11 will disengage from the device. The chain link 11c transmits the load imposed upon the chain to the tilting block through engagement in the pocket 35. The pocket 35 is disposed transversely to the chain thrust line 36, so that the chain link which it holds will lie at an obtuse angle somewhat greater than 90° with respect to the thrust line, in locked position and provide clearance for the spring-biased secondary latch 30. The latch 30 is mounted below the link 11c in a position to retain the link in the pocket 35 and the slot 33, so that the link will not drop out of the block 17 if the chain should temporarily become slack. The spring-biased latch 30 can be moved manually to an inoperative position for removal of the chain link without releasing the entire mechanism. This construction allows simple insertion of a different link thereby facilitating adjustment of chain length. A stop member 19 is provided for the purpose of limiting tilting movement of the block. The stop member 19 holds the block 17 steady while the chain link 11c is being inserted in the pocket 35 and also limits tilting movement of the block on release of the chain from the device. In operation, the end of the chain 11 is attached to the cargo as illustrated in Fig. 1 of the ’767 patent, and the chain is pulled taut and link 11c is pressed into the pocket 35, momentarily depressing the spring latch 30, which returns to its operative position as soon as the link is seated. This operation carries the adjacent link 11a into the slot 33. Tension is then applied to the chain 11 by rotating the large threaded nut 45 to tighten the securing device. When tension is to be released, the handle 25 is pulled out of engagement in the slots 29, which normally hold it securely in place, and is swung out to move the cam legs 22 out of engagement with the mating *729 legs 20 formed on the tilting block 17, thus permitting the block to tilt and release the chain.
17. Plaintiff has asserted that claims 1, 3, and 4 of the ’767 patent are infringed 'by defendant’s use of devices manufactured by the AID Corporation. Claim 1 is representative and is reproduced below in indented paragraph form to facilitate identification of elements defined.
Olarni 1 of the ’767 Patent
1. A device for connecting to a chain to transfer a load thereto, said device having
a frame located generally in line with a loaded chain connected thereto,
a block member pivotally supported near one end of said frame, said block member incorporating
a flattened oval shaped pocket adapted to engage a chain link disposed generally transverse to the loaded chain,
said block member also incorporating a slot connecting with said pocket to accommodate a chain link extended in the direction of the loaded chain,
a latch structure pivotally supported on said frame and having a part engaging said block member to retain it in chain connected position and
a secondary latch pivotally supported by said frame in position to engage and retain the chain link in said slot.
Claim 3 recites a stop element not present in claim 1 and does not recite the secondary latch. The elements of claim 4 correspond to the elements recited in claim 1, but in claim 4, the position of the secondary latch is specifically described.
18. Defendant has contended that the asserted claims of the ’767 patent are invalid in view of the prior art which existed at the time the invention was made. To support this contention, defendant has referred to the prior domestic patents to Harrop, 907,495, issued in 1908; Moore, 1,179,951, issued in 1916; and 'Stahl, 1,963,634, issued in 1934; and also to a French patent to Aivaz, 965,882, published in 1950. Defendant urged that patent claim 3 is anticipated by either the patent to Stahl or the patent to Harrop and invalid under Title 35 U.S.C. § 102. Patent claims 1 and 4 are urged as *730 being obvious and invalid under Title 35 U.S.C. § 103 in view of Stahl and either Moore or Aivaz, or Harrop and either Moore or Aivaz.
19. Stahl patent 1,963,634, defendant’s exhibit 207, incorporated by reference, relates to a sling used for handling bundles of sugarcane or other materials. Referring to Figs. 1, 2, and 5 of the Stahl patent, the sling includes a pair of side plates 10 and 11, a hook 40 having a heel 52 and pivotally mounted between the side plates at the left end of the device as seen in Fig. 1, and a chain-guiding roller 12 at the right end. A chain 13 extends 'between the side plates and against the roller 12, passes downwardly on the right around a bundle of sugarcane, and returns upwardly on the left. The chain may terminate in a ring which is slipped over the hook 40 and held in the hook’s inner curve 43 during lifting of the load. If the chain is too long, the ring is not used, and two intermediate links 49 and 51 of the chain are slipped into recesses formed in the forward edge of the hook structure 40. The heel 52 of the hook member 40 is notched at 53 to engage a plunger 54 which is reciprocable within the casing 55. Release of the plunger 54 is effected by means of the rocking lever 64, which has a knob at its lower end to engage a cup formed in the top of the latch plunger; and a socket at its upper end, into which a rod or bar is inserted when the release is to be operated. The Stahl patent was cited by the patent examiner prior to the allowance of the patent claims in suit.
20. The Stahl patent does not disclose the elements of claim 3 of the ’767 patent or their equivalente The frame of the Stahl sling is not generally in line with a loaded chain connected thereto. If the frame of Stahl was alined in a straight loaded chain, the chain link would hop out of the pocket in hook member 40. The pocket 50 of Stahl is not adapted to engage a chain link disposed generally transversely to the loaded chain. Tire Stahl construction does not include the secondary latch defined in patent claims 1 and 4. The Stahl latch structure 53-54 is not pivotally supported on the frame.
21. Harrop patent 907,495, defendant’s exhibit 210, incorporated by reference, discloses a form of a cargo tie-down *731 toggle hook permanently attached to a supporting structure. The Harrop clamp includes a base member 10 bolted to the underside of a car platform 12, and a swinging member 24 hinged to the base at its outboard end. In attaching the chain 31 to the hook, a link is slipped over hooks 32 and 33 on the swinging member 24, and the adjacent link lies in a recess in the member while the member 24 hangs vertically downward as illustrated in Fig. 4. Then the member 24 is swung up into a horizontal position, where its free end is engaged by a pin 27 on a trip lever 23. Thereafter, small logs 37 are laid on top of the load to impose tension on the chain 31. The device is released by pulling on the left end of a reach rod 35 extending underneath the width of the car, thereby moving the trip lever 23 and pin 27 out of engagement with the member 24 and allowing that member to swing down and release the chain.
22. The Harrop patent disclosure does not respond to the terms of patent claim 3 of the ’767 patent. The Harrop patent frame is not located generally in line with the loaded chain. Load is imposed upon the chain 31 by placing the cap logs on top of the previously stowed logs after the toggle hook device has been locked in its closed position. Harrop does not teach the concept of providing a pocket adapted to engage a chain link disposed generally transversely to the loaded chain. In the ’767 patent in suit, the chain pocket is so oriented that the chain link which is nested into it is required to extend laterally away from the device, thereby providing room to operate a secondary latch. The Harrop patent does not suggest this claimed construction. The Harrop device does not have a cylindrical stop member such as that defined in claim 3. Claim 3 is novel over the constructions disclosed in the patents to Stahl and Harrop and is valid under the provisions of Title 35 U.S.’C. § 102.
23. In considering validity under 35 U.S.C. § 103, neither Stahl nor Harrop suggests the cargo tie-down defined in patent claim 3 wherein a frame is located generally in line with a loaded chain connected thereto. These patents do not render obvious the positioning of one link of the chain in a transversely disposed pocket so that the chain is retained in the pocket upon application of a load in line with the frame. *732 Neither of these patents suggests a pivotally supported latch. The concept of utilizing a cylindrical stop member to limit rotation of the block is also not dbvious from the teachings of Stahl and Harrop.
24. The secondary latch member specifically recited in patent claims 1 and 4 is not shown in the patent to either Stahl or Harrop. The patents to Aivaz and Moore are urged by defendant as rendering the secondary latch defined in claims 1 and 4 an obvious feature.
25. The French patent to Aivaz, defendant’s exhibit 208, incorporated by reference, shows a suspension hook for a lifeboat. In all embodiments illustrated in the Aivaz patent, a ring 4 engages a hook 3, which is pivoted to the upper left comer of a triangular plate 1. The load is suspended from point 5 of the plate 1. In closed position, the hook extends horizontally to the right of the pivot 2, and its integral shank 6 also extends horizontally with its tip engaged by pin 7 which is notched at 7a. Notation of the pin 7 allows the tip of the shank 6 to pass through the notch and allows the hook 3 to swing counterclockwise to release the ring 4. To prevent accidental escape of the ring from the hook, Aivaz provides a safety catch which is a spring-operated or gravity-operated detent 10, pivoted at the upper end of the hook 3 in notch 9. The detent 10 tilts to pass the ring when the latter is swung into the curve of the hook, but is restrained from tilting in the opposite direction either by its own weight or by a spring. In the embodiment of Figs. 3 and 4 of the Aivaz patent a gravity-operated latch 12 acts as a keeper to prevent the ring 4 from slipping out of the hook 3. The latch 10 pivots to pass the ring when the latter is swung into the curve of the hook, but is prevented from pivoting in the opposite direction by a pin 14. The Aivaz French patent was considered and cited by the patent examiner prior to allowance of claims 1 and 4 of the ’767 patent in suit.
26. Defendant has not shown how a latch such as is shown in Figs. 3 and 4 of Aivaz could be used with a device such as is illustrated by Stahl or Harrop. Both the Stahl and Harrop constructions were designed for automatic release of the load when a single latch is released. The teachings of the ’767 patent are required before it is apparent that a cargo tie- *733 down usable at any attitude can include primary and secondary latches, both of which will release upon release of the primary latch.
27. Moore patent 1,179,951, defendant’s exhibit 209, incorporated by reference, discloses a hook for attachment to a chain. The shank of the hook, to which the chain is attached, consists of a pair of inwardly curved tines 11 whose tips are spaced apart to provide a slot through which one link of chain passes, and whose inner contours provide a pocket in which an adjacent link of the chain is received. The latching member is a sliding bolt 15 which passes between the tines. No mechanism is shown or described in the Moore patent which would permit the automatic release of the latch bolt 15.
28. Defendant has contended that the Moore patent and the Stahl patent show that patent claims 1 and 4 are drawn to an obvious combination. If the latch bolt 15 of Moore is added to the periphery of Stahl’s hook 40, as suggested by defendant, the projecting boss 16 would prevent the chain or the terminal ring on the chain of Stahl from engaging the hook, and it would prevent the Stahl device from operating as Stahl intended, to release its load upon actuation of the release lever 60. The suggested combination would lack a major function of the patented device which is to effect release of the chain automatically when the primary release is operated. There is nothing in the Stahl patent or in the Moore patent which would make obvious, at the time the ’767 invention was made, any combination of the Stahl and Moore patent structures.
29. Neither the Harrop patent nor the Moore patent suggests addition of the Moore latch to the Harrop clamp. Such a combination would defeat a primary purpose of the Har-rop patent, which is to provide a chain anchor on one side of the car platform which can be released from the opposite side. The latch bolt 15 of Moore can be released only by sliding it outward in its boss. The combination urged by defendant lacks a basic function of the ’767 device, for release of the primary latch of Harrop would not release a chain latched in place by the bolt of Moore.
30. In summary of findings 16-29, it is found that claims 1, 3, and 4 of the ’767 patent are novel and drawn to unobvi *734 ous subject matter. Claims 1, 3, and 4 are valid under the provisions of 35 T7.S.C. §§ 102 and 103.
31. A chain tie-down device manufactured by the AID Corporation, alleged to infringe patent claims 1, 3, and 4 of the ’767 patent is plaintiff’s exhibit 132 herein. An element for element correlation of the AID device and claim 3 of the ’767 patent is set forth in plaintiff’s exhibit 106. Defendant urges as a structural difference between the accused AID device and the invention defined in claim 3, the member or lever in the accused device pivotally connecting the block to the frame. It is found that the block and lever of the AID device constitute a functional unit which is the full equivalent of the pivotally supported block member recited in the patent claims in suit. The AID block and lever unit provides for partial release of a tension load prior to disengagement of the chain from the block. The AID block and lever perform all of the mechanical functions of the ’767 block member 17 to obtain similar results. Belease of a tie-down chain by the AID device is accomplished in accordance with the language of patent claim 3 and the teachings of the patent specification. Tension load on the chain, as recited in claim 3, is the force which slides a chain link from the tilted block in the AID device. The incorporation of a lever in the AID device which acts in conjunction with the block in the AID device to perform the functions of a block member does not avoid infringement of patent claims 1 and 4.
32. In comparing patent claims 1 and 4 with the AID device, defendant also notes that the secondary latch structure of the AID device is pivotally supported on the block while in claim 1 the secondary latch structure is defined as pivot-ally supported by the frame, and in claim 4 the secondary latch structure is defined as supported on the first latch structure. The positioning of the secondary latch of the AID device does not respond literally to the terms of claim 4. The recitation of the position of the secondary latch in claim 1 reads on the AID device in which the secondary latch is pivotally supported on the block which is pivotally supported by the frame. The secondary latch recited in patent claims 1 and 4 corresponds to the secondary latch of the accused AID device, and the results obtained are the same. In both the ’767 device, as illustrated in the patent draw *735 ings, and the AID device, tbe secondary latch is pivotally mounted to extend to a position near the entrance to the chain pocket. In both devices, the secondary latch will deflect to allow for the entry of a chain link into the slot, and will then automatically spring back to retain the link in the slot and the pocket. In both devices the secondary latch can be manually moved to release the chain link from the pocket, if desired, and in both devices movement of the tilting block to chain-release position automatically releases the secondary latch. All the functions of the secondary latch are described in the specification of the ’767 patent. Claims 1, 3, and 4 of the ’767 patent have been infringed by the AID device.
33. The prosecution file of the application which issued as the ’767 patent shows that original claim 3, which was canceled, recited the positioning of the secondary latch in functional terms, as follows: “a secondary latch member movably positioned close to said pocket part to permit entry of a chain link into the pocket part and to prevent withdrawal of the link.” During the prosecution of the case before the Patent Office, this functional recitation was replaced by a structural recital. The changes in the claim terminology relative to positioning of the secondary latch were not made to distinguish claims 1 and 4 from the prior art. The arguments relative to the secondary latch recital in patent claims 1 and 4 and their predecessor claims were directed to the function of the secondary latch, not to the structural positioning of the secondary latch.
34. A feature used to distinguish all the allowed ’767 claims over the prior art developed by the Patent Office was stated by the applicant as follows:
* * * It will be noted that in each of the five revised claims now in the application, the block member with the link pocket and link slot have been described in definite terms which bring out the transverse position of the link which transfers the load from the chain to the device. There is nothing in the prior art which shows a structure of this nature for use with a loaded chain.
This argument resulted in allowance of all five claims present in the application at that time. Included in these five claims *736 was issued claim 3 which does not recite a secondary latch and does not depend upon a recitation of position of the secondary latch for patentability.
35. Hubbard patent 2,499,753, defendant’s exhibit 211, was considered by the patent examiner during the prosecution of the ’767 application. The toggle mechanism of the chain-tightening device illustrated in the Hubbard patent is similar in one functional respect to the block and lever unit of the AID device. Relaxation of chain tension prior to release of the chain, a function of the block and lever unit of the AID device, is similarly accomplished by the toggle mechanism of Hubbard. This one similarity in function of the AID device to a prior art device does not alter the fact that the AID device follows the teachings of the ’767 patent. The partial release of tension of the AID device is an additional function of the AID device and is not a substitutional function when the terms of the ’767 patent claims are applied. The AID device embodies all the functional aspects of the patent claims.
36. In summary of findings 31-35, it is found that the accused AID device falls within the scope of devices defined and covered by patent claims 1, 3, and 4 of the '767 patent. The block and lever unit of the AID device is an equivalent of the pivotally supported block member recited in patent claims 1, 3, and 4. The recitation of the mounting of the secondary latch in claim 1 is broad enough to apply to the AID device. The position of the secondary latch of the AID device is fully equivalent to the position of the secondary latch recited in claim 4. The prosecution file of the '767 application does not preclude the application of the doctrine of equivalents with respect to the position of the secondary latch.
37. Defendant has urged that the United States is entitled to a license under the '767 patent by virtue of fixed price contract AF 33 (038)-22917, sometimes referred to as the 22917 contract, between plaintiff and defendant, and dated March 29,1951. A copy of said contract is defendant’s deposition exhibit 9. The patentee of the '767 patent, in the course of his employment by plaintiff and prior to filing the application for said patent, worked on the project covered by the *737 22917 contract. The scope of work performed by the plaintiff under contract 22917 included the development of a 5,000-pound-capacity cargo tie-down and the delivery of 56 tie-downs. Performance specifications were incorporated in the 22917 contract which called for a chain-type tie-down having an ultimate tensile strength of 7,050 pounds. The drawing accompanying the contract specifications was of a general nature and illustrated a chain-type tie-down similar to the disclosure of Huber patent 2,715,012, not here in suit, defendant’s deposition exhibit 5. Plaintiff had previously demonstrated to Air Force personnel on or about February 15, 1951, a model of still another chain-type cargo tie-down corresponding to Huber patent 2,784,938, not here in suit, defendant’s deposition exhibit 3. This model, which included a fixed jaw and a moving jaw to grasp the chain, formed the starting point for work under the 22917 contract. The total contract price was $7,981.71. Eecords show that direct engineering labor and engineering overhead charged to the Government under the 22917 contract totaled $1,285.36.
38. The 22917 contract contained a standard Patent Eights clause. Subclause (b) of clause 38 required the contractor to grant an irrevocable royalty-free nonexclusive license to the Government to practice or to cause to be practiced for the Government each “Subject Invention.” Subclause (b) also stated that “Nothing contained in this paragraph shall be deemed to grant any license under any invention other than a Subject Invention.” The term “Subject Invention” is defined in clause 38, subclause (a) (i), of the 22917 contract, in the following words:
The term “Subject Invention” means any invention, improvement or discovery (whether or not patentable) conceived or first actually reduced to practice either (A) in the performance of the experimental, developmental or research work called for under this contract, or (B) in the performance of any experimental, developmental or research work relating to the subject matter of this contract which was done upon the understanding that a contract would be awarded.
39. Shortly after the award of the 22917 contract, Huber, while testing the type of cargo tie-down shown in the '938 patent, discovered that the handle would occasionally snap, *738 with risk of injury to the operator. Studies were made to improve the handle, and development work resulted in assembly drawing No. SP-4017, defendant’s deposition exhibit 12, dated January 8,1952. The first six cargo tie-downs called for by the 22917 contract were shipped to Wright-Patterson Air Force Base on April 28,1952, and on May 19,1952, were returned to plaintiff because the jaws would not open to take the chain. 'Correction required the fabrication of new movable jaws. Thereafter, these six cargo tie-downs were returned to Wright-Patterson Air Force Base, on June 10,1952, and were further tested by defendant. On or about October 7,
1952, they were again returned to plaintiff because of failure when submitted to tension tests. Rivets of a stronger alloy were then substituted by plaintiff. These new rivets were of exactly the same size and shape as the rivets first used, and no design changes were required. The six tie-downs were reshipped to Wright-Patterson Air Force Base on November 14, 1952. On March 23, 1953, the contracting officer advised plaintiff that the six cargo tie-downs had been accepted. Plaintiff was then authorized to proceed with the manufacture of the 50 identical cargo tie-downs. Acceptance of the 50 additional units was made by defendant on August 17, 1953.
40. No charges for plaintiff’s direct engineering service against contract 22917 were made after April 30, 1952, except for a charge of $13.28 in October 1952, when the stronger alloy rivets were substituted.
41. Plaintiff disclosed to defendant the improved handle construction of the device supplied as a “Subject Invention” under the contract. Subsequently, plaintiff filed a patent application on the subject matter so disclosed and granted to defendant a royalty-free and nonexclusive license thereunder. The patent application issued as Huber patent 2,848,777, not here in suit, defendant’s deposition exhibit 4.
42. Within the time period January 26, to February 26, 1953, Huber conceived a new chain-type tie-down device, with a pivotally supported tilting block, for 10,000-pound-load capacity. His work on this 10,000-pound-capacity cargo tie-down resulted in the tilting block type of device shown in the unnumbered drawing, defendant’s deposition exhibit *739 22, entitled “Proposed 10,000 lb. Tiedown Device,” dated February 26, 1953. The structure shown in this drawing is that disclosed in the ’767 patent here in suit. A working model of the unit represented in the February 26,1953, drawing was shown to Wright-Patterson Air Force Base representatives about April 15, 1953, and its novel features and capabilities were discussed. At the request of defendant’s Wright-Patterson Air Force Base representatives and on or about April 28,1953, an assembly drawing, SP-A038, defendant’s deposition exhibit 23, was forwarded to Wright-Patterson Air Force Base representatives, with a letter which compared the advantages in weight, size, and performance of the new device with the model C-2 cargo tie-down of 10,000-pound capacity. On June 19,1953, defendant issued a purchase order to plaintiff for twenty 10,000-pound cargo tie-down devices like those shown in the drawing SP-4038. This was a standard purchase order which contained no contractual obligations with respect to patents. The 20 articles called for were delivered in September 1953, and were paid for in due course.
43. The accounting records in evidence establish that the Government did not reimburse plaintiff for the engineering work responsible for the development of the tiltable block chain tie-down device of the ’767 patent. The 10,000-pound-capacity unit of the ’767 patent was produced by the plaintiff at its own expense, in its own plant, and with its own facilities. No portion of the cost of its development was paid for by the defendant under the 22917 contract, or otherwise. None of the special tooling purchased to make the units supplied under contract 22917 was used in the manufacture of the device of the ’767 patent. Not one of the elements of the tilting block type of device was fabricated from drawings that had been made to fabricate the device of the 22917 contract. The engineering development work under contract 22917 was completed at least as early as November 14,1952, the date on which the six prototype units, with stronger rivets substituted, were returned to Wright-Patterson Air Force Base.
44. The invention disclosed in the ’767 patent was conceived and first reduced to practice after the performance *740 of any experimental and development work done under contract 22917. Comparison of plaintiff’s physical exhibit 134, which exemplifies the device supplied under the 22917 contract, with plaintiff’s physical exhibit 131, which embodies the invention of the ’767 patent, shows a dissimilarity in structure and function which extends to all the claimed features of the ’767 patent.
45. On or about May 3, 1960, plaintiff notified defendant that tie-down devices which Entwistle Manufacturing Company was proposing to supply under Contract N383-62352A would infringe certain claims of patents 2,715,008, 2,848,777, and 2,903,767. This notice was referred to Commander J. C. Warfield, Jr., Associate Patent Counsel, Office of Patent Counsel, Department of the Navy. Warfield investigated the question of whether the Government was entitled to a license under the ’767 patent. He had access to most of the information and accounting records here in evidence. After a conference with representatives of Eastern Eotor-craft Corporation, Mr. Warfield wrote in a conference memorandum dated June 8, 1961, plaintiff’s exhibit 126, that:
These accounting records clearly establish that the Government did not reimburse EEC [plaintiff Eastern Eotorcraft Corporation] for the engineering development of the tiltable block chain tie down covered by this patent. Therefore, even though this tie down was conceived and first actually reduced to practice during the period of the Air Force contract, it was an independent development of EEC * * *.
46. In summary of findings 37-45, it is found that defendant, under the terms of the 22917 contract, is not entitled to a royalty-free license to practice or cause to be practiced the invention disclosed and claimed in the ’767 patent.
Conclusión or Law
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that claims 1, 2, 4, 6, and 7 of patent 2,715,008 are valid and have been infringed by defendant; that claims 1, 3, and 4 of patent 2,903,767 are valid and have been infringed by defendant’s unlicensed use of the subject inventions; that *741 plaintiff is entitled to recover reasonable and entire compensation; and judgment is entered to that effect. The amount of recovery will be determined pursuant to Rule 47 (c) (2).