**MINE SAFETY APPLIANCES COM-
PANY and United Tanks, Inc.**

v.

**The UNITED STATES.**

**No. 307–60.**

United States Court of Claims.
July 15, 1966.

Julian Miller, Pittsburgh, Pa., attorney of record, for plaintiffs, Jo. Baily Brown and Brown, Critchlow, Flick & Peckham, Pittsburgh, Pa., of counsel.

G. M. Paddack, Washington, D. C., with whom was Asst. Atty. Gen. John W. Douglas, for defendant, Michael T. Platt, Washington, D. C., of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS and COLLINS, Judges.

## OPINION

DAVIS, Judge.*

This is a claim for reasonable and entire compensation under 28 U.S.C. § 1498 for the unauthorized use and manufacture by or for the United States of the alleged invention disclosed and claimed in U.S. Letters Patent 2,625,683, entitled "Crash Helmet," which issued January 20, 1953, on an application filed December 8, 1947. Plaintiff, United Tanks, Inc., is a California corporation and is the owner (by assignment) of right, title, and interest in and to this patent, subject to an exclusive license for a limited use granted to plaintiff Mine Safety Appliances Company, a Pennsylvania corporation. Previously, the defendant moved to dismiss the suit as to plaintiff Mine Safety Appliances Company on the ground that Mine Safety owned no interest in the patent and therefore this court did not have jurisdiction under Section 1498. The motion was argued before the court which denied it on March 23, 1962, following the position taken in Pratt and Whitney Co., Inc. v. United States, 153 F.Supp. 409, 139 Ct.Cl. 540 (1957).

The subject matter of the patent (the '683 patent) concerns a crash helmet having a crushable, substantially inelastic, energy-absorbing liner disposed between a rigid outer shell and a resilient inner liner adapted to accommodate the helmet comfortably to the wearer's head. The suit is based on the alleged infringement of claims 1 and 14–18 by crash helmets procured by the defendant during the 6-year period preceding the filing of the petition. The parties have agreed to a separation of the issues for trial. The questions of validity, infringement, and license are now before the court.

The use of helmets and body protective devices utilizing rigid outer armor plate in combination with various padding and shock-absorbing materials dates back to man's earliest conflicts and sporting contests. These helmets and other protective devices have become more sophisticated through the years with the advent of

---

* The court acknowledges its indebtedness to Trial Commissioner Donald E. Lane from whose opinion, prepared at the direction of the court under Rule 57(a), we have borrowed. Though we agree with the trial commissioner that the petition should be dismissed, we place our holding on a ground he rejected and do not reach the basis on which he relied or other issues he discussed.

better materials and the need for greater protection in modern warfare. Historically, numerous materials have been used to provide padding and shock absorption, including solid and granular cork compositions, papier mache, felt, asbestos, animal and mineral fibers, and the more modern polystyrene foam plastics, such as cellular cellulose-acetate.

For this case it is helpful to distinguish between the properties of shock absorption and energy absorption in the context of helmet construction. Shock absorption absorbs the energy of a sudden impulse force and transmits the absorbed energy over a greater area so that the resulting unit force transmitted to a given area is less than the total applied force. Shock-absorbing materials provide a time lag between the impulse force and the transmitted force but substantially all of the energy absorbed is released as the material regains its initial configuration due to elasticity. Energy absorption is characterized by the dissipation of the energy of a sudden impulse force through a permanent deformation of an *energy-absorbing material*, thus substantially reducing the force transmitted through the shock-absorbing material. Energy-absorbing materials also act as shock absorbers but some shock-absorbing materials have poor energy-absorption properties. Hard rubber is an example of a material having good shock-absorption but poor energy-absorption properties. Hard rubber would absorb the energy of an impulse force and transmit the energy through the rubber over a larger area resulting in a transmitted unit force that is somewhat less than the impulse force. A short time delay between the impulse force and transmitted force would be effected by the compression and rebound of the elastic rubber but energy loss as the impulse force is transmitted

through the rubber is negligible. Cellular cellulose-acetate, on the other hand, exemplifies a material having high energy-absorption properties. As an impulse force sufficient to break down the cellular walls is applied, the impulse energy is dissipated through the cell wall breakdown, resulting in a much smaller transmitted unit force. It is apparent that all of the materials named above have good shock absorption but relatively poor energy absorption except the polystyrene foam plastics or cellular cellulose-acetate which exhibits high shock and high energy absorption.

The claims of the '683 patent define a protection device comprising a relatively hard outer shell, a layer of non-resilient, crushable, energy-absorbing material, and a lining of soft resilient material. The claims are set out in detail in findings 9 and 10.

Trial Commissioner Lane found the patent invalid, under 35 U.S.C. § 103, "as failing to define patentable invention over the prior art." We do not reach that issue, or certain other defenses presented by the Government,[1] because we are satisfied that the United States has been granted a license under the patent.

The co-patentees, Charles F. Lombard and Herman P. Roth, were employed by the University of Southern California (U.S.C.) in its aviation medicine program. When Dr. Lombard joined the faculty in January 1946 as Associate Professor of Aviation Medicine, the University held a contract (due to terminate on June 30, 1946) with the Federal Government's Office of Scientific Research and Development (OSRD). This OSRD agreement, as amended, called upon U.S. C. to "conduct studies and experimental investigations in aviation physiology with particular attention to the effects of acceleration, decompression, anoxia, and cold, and methods to combat these ef-

---

1. Other defenses include: (1) the claims are invalid under 35 U.S.C. § 102 in view of the prior art and because the alleged invention was in public use in this country more than one year prior to the patent application; (2) the claims are invalid under 35 U.S.C. § 112 for indefiniteness and lack of disclosure; (3) the United States has a "shop right", as well as an immunity under 28 U.S.C. § 1498(a).

fects." Early in April 1946, the University entered into a related contract with the Navy (Contract No. N–ori–77 and Task Order I thereunder) providing that:

(1) The Contractor shall, in accordance with any instructions issued by the Director of the Planning Division, Office of Research and Inventions, furnish the necessary personnel and facilities and shall conduct research, using a human centrifuge, on the physiological, biochemical and anatomical effects of acceleration on the body, relative to pilot position in high speed aircraft, and shall investigate and study:

(a) *Physiological Effects:* The mechanisms operating in the pooling of blood; dynamics of circulation within the skull and the laws governing intracranial pressure; the load on the heart and its capacity to operate under high acceleration; and the vasomotor reflexes.

(b) *Biochemical Effects:* The changes in the blood in its passage through the brain under conditions of reduced flow incident to acceleration.

(c) *Anatomical Effects:* The capacity of the tissues to withstand high acceleration without tearing, rupturing, or bruising; and the displacement of organs in the body under high acceleration. [Emphasis in original.]

Lombard was assigned by U.S.C. for full-time work on the project covered by this contract, and was so employed during the making of the alleged invention, as well as while the patent application was pending. Roth, who came to the University on May 29, 1946, as an engineering consultant, was not formally assigned to the Navy work until after the making of the invention.

The Government's patent rights under the Navy contract were established by Section 17 of that document:

(a) Where used in this Section, and not elsewhere in this contract, the expression "Subject Invention" means each invention, improvement and discovery (whether or not patentable) conceived or first actually reduced to practice (i) in the performance of this contract, * * * or (ii) in the performance of any research or development work relating to the subject matter hereof which was done upon the understanding that this contract or any subcontract hereunder would be awarded * * *.

(b) Contractor agrees to and does hereby grant to the Government an irrevocable, non-exclusive, non-transferable and royalty-free license to practice, and cause to be practiced for the Government, throughout the world, each Subject Invention in the manufacture, use and disposition according to law of any article or material, and the use of any method * * *.

Since it is agreed that one having a license under a patent has a complete defense to a charge of infringement when the patent or invention is used in accordance with the license agreement (De Forest Radio, Telephone & Telegraph Co. v. United States, 273 U.S. 236, 242, 47 S.Ct. 366, 71 L.Ed. 625 (1927)), the ultimate question before us is whether the patent in this case was covered by Section 17 of the contract.

The trial commissioner thought that the crash helmet which forms the basis of patent '683 did not come within the scope of the Navy program, and was therefore not covered by the license provision. His view was that (a) the Navy contract was primarily concerned with physiological studies of the effects of acceleration on the human body, utilizing a government-supplied centrifuge located at U.S.C., and was not intended to include the design and development of a protective crash helmet; (b) the Lombard-Roth research project for development of a crash helmet was separate from the Navy project (though carried on simultaneously), and was largely financed as to testing and instrumentation by private funds obtained by the University; and (c) the patented helmet was not finally reduced to practice in the centrifuge building originally supplied by

the United States under the OSRD contract. The defendant insists that these conclusions, fused from both law and fact, are much mistaken.

As we assess the record, there was, at the least, a close connection between the Navy contract and the U.S.C.'s helmet project. In the first place, the prior OSRD contract, like the Navy agreement, concerned, in general, the effects of acceleration upon flyers' bodies, and the University's final report under that contract (submitted about three months after the consummation of the Navy agreement) said that "it is anticipated that future work in aviation physiology at the University of Southern California would be along the lines already studied by the group [working under the OSRD program]. * * * Physiological studies of the effects of *abrupt acceleration* on the body and the aircraft design changes and *personal protective gear necessary to decrease the hazards of crash landings will be undertaken*" (emphasis added). The plaintiff says that this does not prove, in itself, that protective-gear work was to be undertaken under the Navy contract, rather than independently, but we think that the University's statement does require us to scrutinize very carefully the present claim of true and total independence. In other respects U.S.C. explicitly recognized that projects carried on under the umbrella of the OSRD contract were extended under the Navy program; and the Navy clearly considered its contract to be a prolongation of the earlier one. The least that can be said is that in large measure there was undoubtedly continuity.

It is also plain that both the Navy and the University expressly anticipated that one of the results of the Navy-contract work would be the development of better protective gear. U.S.C.'s original contract proposal envisaged as a practical application of the research, "the development of methods to protect humans against the very high accelerations that will be possible in future planes", and then added:

The development of these methods will be greatly helped by understanding the basic physiological reactions of the body to high accelerations. It would be our aim to work in close cooperation with local designers and test pilots so that any methods we develop would be at the same time practical and possible in practice. Blueprints and/or drawings will be furnished of any model or prototype developed.

The Navy's memorandum approving the idea of the contract with U.S.C. declared that "the results of the research will be of use in the field of Naval aviation in the development of protective equipment and change of pilot position to protect the pilot from high acceleration forces developed by high speed aircraft." One of the plaintiffs' answers to these materials is that the "acceleration" mentioned by both the Navy and U.S.C. was solely "whole body acceleration" and not "impact acceleration of the head" (as in a crash). But "acceleration" is a general term often used to embrace the impact variety—we point out below that both parties later expressly recognized impact research as coming under this contract—and flyers' helmets are useful not only in crash landings but for possible impacts occurring in the midst of turbulent high-speed flight. In any event, the parties foresaw that improved protective gear, at least of some sorts, could result from the theoretical and practical knowledge gained through the Navy contract. The mere advancement of pure science was not the only goal of the program.

Next, the helmet project was largely carried on by Lombard and Roth in close physical proximity to the conceded Navy work in the centrifuge building; most, if not all, of Lombard's activities, as we have mentioned, were under that contract for the entire period of its existence (1946–1950). We do not overturn the trial commissioner's finding that the helmet was not finally reduced to practice in the centrifuge building, but it is indisputable that much of the prior work was carried on there cheek by jowl with

research admittedly covered by the Navy's agreement.

There are, too, definite post-invention[2] indications that the Navy considered research related to crash helmet development as covered by its contract, and that U.S.C. acquiesced in that position. In the middle of 1948, Dr. Lombard transmitted to the Director of the Medical Science Division of the Office of Naval Research a proposal for a separate research project on cerebral injury, with the goal of furthering head protective gear, including crushable, shock-absorbent material. The Director replied that funds for such a separate project were not then available, but that "in the meantime, the research can be continued *as in the past*, under Task I of Contract N6–ori–77 [the Navy contract] as provided for under paragraph A 1 (c) * * *." From 1949 to 1951, the University (Lombard, in particular) clearly recognized, in communications and reports, that this research work on head impact (including impact acceleration of the human head using protective headgear), as carried on from 1948, was under the contract. For instance, the final report (in March 1951) on the Navy agreement (covering the period from April 1946 to August 1950) referred to one of its achievements as the opening up of "the study of the tolerance of the human to impact acceleration of the head"; and in this same report there are summaries of studies on "voluntary tolerance of the human to impact accelerations of the head" and "new materials for controlled impact energy absorption" —the latter including specific mention of "preliminary studies * * * of various materials which might find application in the protection of the human body (especially the head) against im-

pact forces", as well as "theoretical analysis and experimental results demonstrat[ing] that low-density materials exhibiting largely non-resilient behavior under impact forces have definite value in design of protective equipment." [3]

Plaintiffs insist that all this was physiological and theoretical research, not the practical development of gear, and that it came after the invention in suit. The documents do not entirely square with this position, but even so the irreducible facts are that both parties treated research on important aspects of head impact as covered by the existing Navy contract which began early in April 1946, and that both parties understood that such coverage was not restricted to work requiring use of the Government's centrifuge.

From these and other items in the record the defendant argues that the development of protective head gear was itself an integral part of the Navy contract —a full component, in its entirety, of the subject to be studied from April 1946 on.[4] Plaintiffs reply, and the trial commissioner agreed, that the contract, properly construed, covered only physiological research into the effects of acceleration on the human body, not the practical development of protective devices to prevent impact injuries; the development of equipment or devices, if any, was to be directed to methods of combating the effects of "whole-body" acceleration forces, through use of the centrifuge, rather than impact forces. It is also pointed out that U.S.C. paid for the testing of the helmet project (as well as the instruments needed for testing) through non-government funds (solicited from the aviation industry), and in its own

2. Plaintiffs claim that the invention was conceived in June—July 1946 and first reduced to practice not later than the fall of 1947. The patent application was filed early in December 1947.

3. This study was apparently first presented publicly in June 1948 by a group including Lombard and Roth. In 1949, a report by Lombard and Roth under the Navy contract characterized "a check on

information relating to impact acceleration of the head" as "a part of the program of investigation of the physiological effects of acceleration on the human body, conducted under Contract N6ori–77, Task I [the Navy contract]."

4. The defendant points out that the contract was explicitly one for research *and* development.

mind treated the project as independent of the Navy contract.

There is little doubt that the University thought that the helmet undertaking could be kept entirely separate—legally speaking—from the Navy research and development work,[5] but we think that it erred in this belief. There was a close and umbilical connection which was not, and could not be, severed. We need not go so far as to say that the helmet program as a whole was an integral part of the Navy contract—though there is strong support for that position—but we do hold that the license clause of Section 17, supra, covered an invention so intimately tied to the work to be done under, and the results anticipated from, that agreement. As suggested above, we read the scope of the Navy program in accordance with the parties' contemporaneous construction—and contrary to plaintiffs' present contention—as including from the beginning head-impact research within the contractual concept of "acceleration".[6] We also draw from the contract, its background, and history, that both parties expected that practical developments in protective devices could well result from the knowledge to be acquired under the contract. It is in this double light that we apply Section 17.

■■■ That provision, in granting the United States a royalty-free non-exclusive license to practice "each invention, improvement and discovery * * * conceived or first actually reduced to practice (i) in the performance of this contract", does not mean that, before a license can ensue, each and every component of the invention must be found to have occurred or been discovered as an integral part of the contract performance. Nor does the grant mean that the contractor must have been engaged to make the whole of the particular discovery or to study all aspects of the problem. At least in those instances in which the invention was conceived or practiced during the existence of the contract, it is enough that an important factor in the invention was itself within the contractual scope, or resulted directly from the course of contract performance. That is the import, as we understand it, of the general phrase "in the performance of this contract." It is immaterial, therefore, whether or not the practical development of impact head gear was, in and of itself, within the Navy agreement. That was only one aspect, though an important one, of the invention. The physiological, biochemical, and anatomical research on impact-acceleration and the study of energy-absorbing materials—which had to precede or accompany the practical head-gear applications—were also necessary and important components; and such research *was* an integral part of the contract. Without these contract-covered inquiries, the final invention would not have been made.

■■■ Lombard and Roth may have thought that, by fiat, they could carve out this type of research from the Navy work and preempt it wholly for private non-federal benefit—but they could not do so. The original contract of April 1946 included it, and there was neither a formal excision nor an authorized agreement of the contracting officer excluding it. The impact-acceleration research carried on by the inventors and their associates necessarily came under the Navy program.[7] The Government desired and

5. U.S.C. never referred specifically to the helmet project in its reports to the Navy under the contract, and Lombard and Roth seem to have told people that the project was wholly non-federal.

6. In this respect it is significant that there was no amendment of the contract; if impact research was covered in 1948–1950 (as plaintiffs must admit) it was likewise covered in 1946–1947.

7. It should be recalled that Lombard's salary came, almost entirely, from Navy funds and he worked almost full-time on the Navy contract during its entire existence. From the beginning of that agreement to its end he was "co-responsible investigator" (as the final report on the contract phrases it), along with another colleague. The private funds used by U.S.C. for the helmet project went to the *testing* of the head-gear (including instrumentation for testing).

paid for a royalty-free non-exclusive license resulting from that type of research (among others), and neither U.S.C. nor the inventors could avoid that federal right by unilateral action. Such a license is wholly appropriate because Lombard and Roth, in conceiving and first practicing the invention, undoubtedly benefited from this research. We also infer, secondarily, that they probably gained from their knowledge of and proximity to the kind of acceleration research—whole body acceleration experienced in flight—which plaintiffs admit to be under the contract.

■■ It is fitting to read the license-grant of Section 17 liberally, as we do, and not to confine it severely within a narrow compass. "Inventions made under a Government contract are the product of expenditures from the public treasury in the course of a governmental function; the public, having in a sense ordered and paid for the invention through its representatives, should not again be taxed for its use, nor excluded from its use, nor permitted to use it upon restrictive conditions advantageous to no one but the patent owner." [8] This general policy is reflected, for federal employees, in 28 U.S.C. § 1498(a), barring all claims for patent compensation by "any patentee or any assignee of such patentee with respect to any invention discovered or invented by a person while in the employment or service of the United States, where the invention was related to the official functions of the employee, in cases in which such functions included research and development, or in the making of which Government time, materials or facilities were used." [9] This immunity provision has been held to cover instances in which only one of several inventors was a federal employee. Strategical Demolition Torpedo Co. v. United States, 96 F.Supp. 315, 119 Ct.Cl. 291 (1951), cert. denied, 342 U.S. 825, 72 S.Ct. 46, 96 L.Ed. 624. Even in the absence of a patent-license clause in the contract, the same general policy has been applied by this court to give the United States an implied license, as against the contractor-patentee, to use inventions resulting from a federal experimental and development contract. Ordnance Eng'r Corp. v. United States, 68 Ct.Cl. 301, 352–353 (1929). [10] The same liberality should infuse an express contractual provision like Section 17. In the discussions of the last two-and-a-half decades over the patent policy which the Federal Government should pursue in its contracts, there does not seem to have been much question that the United States is at least entitled to a royalty-free non-exclusive license for practice of inventions made under or in the course of a federal contract. [11]

For these reasons, we hold that the United States has a royalty-free license to practice the invention and may not be held liable for compensation for such use by the Government or on its behalf. The plaintiffs are not entitled to recover and the petition is dismissed.

8. Investigation of Government Patent Practices and Policies, Report and Recommendations of the Attorney General to the President, Vol. I, pp. 88–89 (1947).

9. A similar analogy is the common law "shop right". United States v. Dubilier Condenser Corp., 289 U.S. 178, 188–189, 53 S.Ct. 554, 77 L.Ed. 1114 (1933); Consolidated Vultee Aircraft Corp. v. Maurice A. Garbell, Inc., 204 F.2d 946, 949 (C.A.9, 1953), cert. denied, 346 U.S. 873, 74 S.Ct. 122, 98 L.Ed. 381.

10. The court said (p. 353): "Except for the development processes carried on at the expense of the Government, under its supervision and with its suggestions in collaboration and contractual relationship with the plaintiff, these patents would not have come into existence."

11. See the President's Memorandum and Statement of Government Patent Policy, October 10, 1963, 28 Fed.Reg. 10943; Symposium on Patents, Copyrights, and Trademarks, 25 Fed.Bar J. 1 (Winter 1965); Stedman, The U. S. Patent System and Its Current Problems, 42 Tex. L.Rev. 450, 487–94 (1964); Symposium on Government Contract Patent Policy, 21 Fed.Bar J. 3 (Winter 1961); Investigation of Government Patent Practices and Policies, Report and Recommendations of the Attorney General to the President, Vol. I, pp. 4–5, 100, 104 (1947).

COLLINS, Judge (concurring only in the result):

I agree that plaintiffs are not entitled to recover, but I cannot agree with those portions of the opinion of the court which conclude that the United States has been granted a license under the patent in suit and that it is unnecessary for the court to reach the issue of patent validity.

The license issue is difficult to resolve in favor of defendant. The Navy contract (No. N6ori–77) and Task Order I, quoted in the court's opinion, call for research "using a human centrifuge" on the physiological, biochemical, and anatomical effects of acceleration on the body in high-speed aircraft. These effects to be studied are specifically directed to blood circulation incident to high acceleration. Such research was not intended to relate to the development of skull protection against crash impacts and sudden decelerations. It was found that the research centrifuge was *not* used for testing crash helmets. It was also found that *private funds* from the Aircraft Industries Association were used to start the project of developing a crash helmet in the spring of 1946. The Lombard and Roth application for a patent was filed in 1947. In 1948, the Director of the Office of Naval Research wrote that funds for the development of head protective gear were *not* available. The "recognition" from 1949 to 1951 that research work on head impact "as carried on from 1948" was under a contract does not warrant a conclusion that the inventors' work on crash helmets in 1946 and 1947 was, therefore, under the Navy research contract. There is no evidence that defendant obtained an actual license under the patent in suit, and a conclusion that there was an implied license is believed to be hindsight.

It is also my conclusion that the court should resolve rather than bypass the patent validity issue raised by the pleadings and supported by findings. Trial on the merits related to a considerable extent to the presentation of evidence that the Lombard and Roth patent in suit is invalid over prior art. The findings accompanying the court's opinion include many relating to the several patent claims in suit and to the prior United States and foreign patents and publications. It is believed that it is in the public interest and also in the interest of the party asserting invalidity, at considerable trial expense, to have a ruling upon this issue. Since the findings reported to this court state that the patent claims relied on in the patent in suit are invalid over the prior art, I would dismiss plaintiffs' petition upon this ground rather than upon a questionable license theory.